to that 16-0-015. In the state of Ecuador, in the province of Perez, we see that Perez has been going in as an intended use for the state of Ecuador. And it's the plaintiff of Pelham, the state of Heflin, and the plaintiffs are doing on behalf of the nation. The plaintiff of Pelham, Sean A. Cassar, are doing on behalf of the nation. And I believe Mr. Gray will be released. Thank you, Mr. Cassar. May it please the Court? Justices, my name is Sean Cassar and I represent Rosa Perez, the administrator of the estate of Edgar Perez, her son. Excuse me, Counselor, I would ask that you stand in the middle of the podium so the microphone picks up your voice. The oral argument is being recorded and also this is a good courtroom so we need to have your voice project. Thank you. Thank you, Justice. I'm here to argue today that the trial court erred in finding that the defendant owed no duty to my clients in this case. I know that you've read the briefs and let me just start with a question that I don't think is rhetorical. Who in this room, who in this county, would send four adults and two children into their backyard without telling them that there's a pool back there? But Counsel, isn't this really a parental supervision case? Don't we have to focus on the fact that Edgar was unattended and that really was the sole proximate cause of his death? I don't think that it was the sole proximate cause. And the case law in Illinois is clear that just because a parent or a lack of parental supervision at a moment in time doesn't excuse the old man from his duty. And particularly in this case where you've got a poll. If there's a duty. That's right. That's right. But I think in this particular case, if we're looking at a duty, okay, just let's start with the very beginning. This is a premises liability case. And the foreseeability of the injury is so clear, okay. You've got a pool in the backyard. You've not told the invitees of the existence of this pool. And this just isn't any pool. This is a pool with a cover on it concealing the water, okay. This is a pool where the latch is. The cover wasn't completely over the pool. It wasn't. And I think the record is very clear there. If you look at the defendant's own testimony at page 8182, the defense says a child on the deck would not have been able to see the water due to the cover. That's at page 8182, C199 of the record. But the cover wasn't a dark color. It was a light colored, almost see-through type cover, was it not? Here's the key to the cover, right. The cover is hiding the existence of the water from this 34-month-old child, okay. The law in Illinois, and I don't agree with it, and actually Judge Mallory doesn't agree with it, as you saw in the argument. The law in Illinois is that a child of that age and maturity would be expected to understand the dangers of the water. A pool is open and obvious. A pool with water, open and obvious. That, unfortunately, is the law in this case. But the solar cover takes that out of that moment in this particular case. In fact, just the opposite. And what case supports that, that a solar cover takes it out of that? Kim versus TT, which is a 2nd District case. But the facts there were somewhat different, were they not? That was a dirty tarp that was on an in-ground swimming pool and had been there for quite a long time. All true, Your Honor, but those are really distinctions that are relevant because in Kim, the next-door neighbors knew that the pool was there. It was an in-ground pool, no question about it. But the father of the two children that ended up in the pool knew that the pool was there. In fact, the two children in Kim knew that the pool was there and they had been warned not to go into the pool. So the question becomes, in Kim, the reason that the water is open and obvious is because it's concealed from the two minors. And in fact, I think the court goes way out of its way to say that children conceivably would not understand that the tarp itself might not support them if they entered onto it. Furthermore, the court goes on to say, this court, by the way, children might not have appreciated that there was water underneath the tarp. And additionally, in Kim versus TT, the landowner should have foreseen that a child would be attracted or allured to the danger. That's exactly what happened here. These two kids, one 34 months and one younger, through a momentary lapse of attention by perhaps half of the two children, got up onto the area under the pool. And it didn't look like a pool to them. There's no chance. What would it look like? It would look like a trampoline or something fun to play on. It doesn't look like a McDonald's playland. But how do you explain away all the piping and the tubing and the filters right next to the side of that structure? I don't explain it. But this is the case. The pool is back there. I'm not here to tell you that the pool was impossible to see or that somehow the defendant hid it. But the fact of the matter is there's a question of fact as to whether or not the adults saw or should have seen the pool, especially the deceased father. But there's an objective test here, is there not? With respect to open and obvious, this is what a reasonable person using ordinary perception would know. That's the test. Without a doubt. So where is the question of fact? Because they're distracted. The very reason that they're back there, the defendant doesn't tell this family that there is a pool back there and it's open and there's access to it and the gate's broken. You know what he says to them? There's more stuff back there. There's more merchandise back there. He sends them back there. The very reason they're back there is the distraction from the pool. And that's what happens. These folks go back there, and they're shopping, and they don't see. . . They're not paying attention. Well, hey, but there's a reason for it because there's stuff, there's merchandise back there. And I think, you know, we can look at certainly, and I want to draw attention to, okay, the distraction is not that they forgot about the pool. Okay, this isn't Ward versus K-Mart where he saw the post, went inside and came back out and forgot it. I'm not here to argue to this court that it would be reasonable for a parent to forget that the pool was there. Okay? But what happened here is they were distracted from the existence of the pool. A four- or five-foot-tall pool, how is that something that they would be distracted from? I think the record's very clear what happened. The aunt goes back with her two elderly parents. Okay? She's holding her niece. She's talking to her brother, who's got Edgar in the sidecar. They're all communicating about what's going on. She sets her niece down, okay, which by the way is evidence that she doesn't know the pool's there. She then helps her parents, and they look at some stuff and decide that there's nothing there, and they all go back. Whether or not she noticed the pool or not isn't really the standard though, right? It's what a reasonably objective person would see. Okay, and I think that's for a jury to determine, okay? Because let's talk a little bit about the Supreme Court case of American National Bank. In that case, and it's cited in my materials, you've got construction workers working up on a sign on one of the billboards, and there's a puddle right there. They actually have to duck to get around it. Okay? But the testimony was, in that particular case, that there were other individuals who had worked up there and not noticed it. Okay? That in and of itself was enough to create a question of fact. That inference, when taken, like, most favorably to the plaintiff, was enough to send the case to a jury. And that's what we have here. Are they going to be able to stand up to the problem and argue that to a jury that the aunt should have seen the pool? Maybe. They didn't sue the aunt. But she didn't even know her nephew was put in her own charge. That was the tragic mistake here. It sure was. Right. So that she didn't even know she was to be supervising that child. And so, really, again, I come back to, unfortunately, isn't this really a case of parental supervision or, if not parental, family supervision? I'm not here to tell you it's not a case of parental or family supervision. I think that plays a role here. Okay? But just like in Kim, okay, now, if you think about Kim, the next door neighbor is believed, the father of the two children that come over and eventually end up in the pool with Kim, he testified and claimed, and the evidence was, that he left Mrs. Kim, the homeowner, in charge of the children. Well, Mr. Kim testified, that's not right. She went in before the children's father even left. It's the same thing. We've got a miscommunication in Kim so that the father of the children believed that the homeowners were taking care of the children and the homeowners believed that the father had the children. The fact is that they're momentarily unsupervised. And all of us know, anybody who's had children knows that there are moments that our children go unsupervised. Well, that might be more appropriate if the defendant here was placed in control of the children momentarily or something, right? But he's not even part of this. He is never in charge of the children. It's always either aunt or dad. Okay, I'm not here to argue that he's in charge of the children. That's why it wasn't Kim, though. Actually, it wasn't. Well, that's the whole question. In Kim, was Mrs. Kim in charge of the children or not? Actually, that wasn't the question in Kim. The question in Kim was whether there was a duty or not. In the trial they're held, there was no duty. Okay? And then at the appellate court, they said, no, in this particular circumstance, because the water is covered, the water is concealed, because children of this age would not be expected to appreciate the dangers of that water, we're going to find a duty. And in Kim, the court ruled that the parents' lack of supervision may be a defense, but it doesn't hold a duty. That language is in Kim. Right. But in Kim, they talked about the fact that because the tarp was in the condition it was in, being there for nine months, having leaves, being a dark color, that actually it was an attraction or allurement for the children to play on it or adhere it, and that they didn't have the opportunity to appreciate the fact that there was water beneath it. That's different than the swimming pool and what the record shows in the photographs. The pool looked like here, and the cover looked like here. They're totally different. We have to look at these from both perspectives, okay? To Edgar Fernandez, that did not look like a pool. No reasonable person could suggest that a 34-month-old child comes into this backyard and says there's a pool. What does he think it is? I think it's something you jump on, something to play on. So does he recognize it's a trampoline but not recognize it to be a pool? I think he recognizes it to be something fun, bright and colorful. It's attractive. It's an allurement, just like the pool in Kim. Well, certainly our record doesn't reflect any of that. Well, you're right. The record doesn't reflect that. We can't go back and ask Edgar exactly what he's thinking, but we can objectively look at the facts in this case and determine whether or not a landowner has a responsibility to warn folks of dangers on his property. If he has a solar cover on his pool. I mean, there is no evidence that this solar cover was defective or dangerous in a dangerous condition. That's right. The relevance of the solar cover is that it would hide the existence of water from a 34-month-old child. That's the issue here. I would submit to you that under the law in the state of Illinois, if that solar cover is not there, then this is a Mount Zion case and the plaintiffs can't recover. Well, didn't Socorro, though, say that the cover only covered about a fourth of the pool's surface? Edgar's in the pool at that time. Isn't that the testimony that we have? We have some testimony in the morning that in the morning it covered the entire surface, but now we're dealing with the afternoon, so we don't really know what the afternoon is. Well, what we know is when the defendant last saw the pool before Edgar went into it, it was completely covered, and that's the site that I gave you. That's when he said he had looked at it in the morning. Yes, and I don't know when. I bluntly don't want to affirm morning because I'm not sure it was that morning, but the last time he looked at it, it was completely covered. And the only reasonable inference from that is it was completely covered until Edgar went into it. To suggest that the defendants want to argue that, well, the pool was partially uncovered when Edgar was up there because it was partially uncovered when the ant got there, when Socorro got there, well, that's a factual dispute. But certainly a reasonable inference is, based on the fact that the last time the defendant saw the cover, it was in place and there was no water that could be seen. So what did this cover look like, according to the record? Well, you can just describe it. I mean, we've seen pictures of it. It's kind of like I would call it electric blue. It looks fun. It looks like something you'd find in a McDonald's Playland. That's steel. That's how I would describe it. So it was the color of water. Maybe. It doesn't look like water. I mean, you can see it. It doesn't look like water. It looks like something you would jump on. It looks exactly like something that you would jump on. So I just – when we're talking about distraction here, because, again, the truth of the matter is, okay, there's a big pool in the backyard, right? But it's no different than the Ward v. Kmart case or the American National Bank, and I think it's more like American National Bank, where a construction worker actually walks into a power line. It's right there for everybody to see. Why? There was testimony from other co-workers that they had been up there and didn't see it. In this particular instance, there's testimony from Socorro. And it's unequivocal, by the way. She doesn't say maybe I saw it, maybe I didn't. She's unequivocal. I didn't see that pool until I got up on the deck and saved my grandson from going in there, or my granddaughter, I'm sorry, my granddaughter from going in there. From that fact, okay, that raises a reasonable inference that given all of the stuff that was going on that morning, the pool was not visible to Edgar's father. And by the way – That's, again, are you trying to say you're using the formal distraction exception? Is that what you're trying to use as opposed to saying they weren't paying attention? That's right. Of which? I think I'm saying that they were distracted. I think that they were distracted given the merchandise out there, the children, her parents, the whole conglomerate. I think it's very reasonable to understand how she doesn't see this pool. And one other thing, and you know this again from factual testimony, when the aunt goes back out with her parents and her granddaughter, we can tell by the father's reaction that he doesn't know there's a pool there because it's not until the aunt says, realizes that Edgar's missing, and she says, oh my goodness, pool of water. No, no, no. She did that sooner with Kelly. She did it with the first child. That's how she knew. She went up there to find Kelly. So she knew before Edgar. But she didn't know that she didn't, that Edgar wasn't in her, in his father's charge. My point's a different one. And you're exactly right. She knew when she was on the deck that there was water there. But when she comes back out to the side of the yard, or the front yard, and comes in contact with Edgar's father, he says, where's the child? And it's not until she says, hurry back, there's water back there, that he explodes to go back there. That, again, is creating the inference that he has no idea there's a pool back there. But he hadn't walked back there. He hadn't gone back there. Judge French-Mallard suggested, she looked at the pictures in this case, and her ruling was, and this was poor lawyering, I think, on my part. I'm not blaming her. I'm sorry. You're speaking a little too fast. This is poor lawyering on my part. I don't blame Judge French-Mallard. But she did, she wanted to see the pictures, and she made a judgment based on where the father might have been when they were having this conversation as to whether he was coming back or not, as to whether he could have seen the pool. My suggestion is twofold. One is we know because Socorro didn't see the pool until she was on the deck, that there's a reasonable inference the father didn't. And then I think we also know by the father's reaction when she says, go back, there's water, and he goes sprinting back, that I think there's another reasonable inference that he never knew there was a pool back there. And all of this, all of this, okay, getting back to Dewey, all of this could have been prevented with very little magnitude of guarding against it. You know what it would take? This guy who's sitting in his lawn chair directing two children, two elderly adults and two adults in the backyard and saying, hey, there's a pool back there. And you know what? Excuse me, has my timer gone? Yes, it is. I thought the timer has gone. Oh, I apologize. Yes, I think I was distracted too. But just finish your sentence, and then you'll have time for rebuttal counsel. I appreciate your time. And as you can see, I'm very emotional and emphatic about this. But I do think the law in the state of Illinois should protect children in these circumstances under these facts. Thanks. Mr. Frey, how do you pronounce your last name? Fabricius. Fabricius. Thank you. Good morning. Good morning. If it pleases the Court, it's an honor to be here. I have to apologize about my brief. To the Court, to Mr. Kasterman, and to Siraco Fernandez, in my preparation of the brief, I referred to her as the great-aunt of Edgar rather than the aunt. She's there with her granddaughter in writing, and I just had the relationship confused. That pool was open and obvious. That solar cover did not cover the pool. It covered whether it was all of or part of the water. The solar cover is cut, and it fit within the perimeter of the pool. The case law in Illinois is that children who are allowed to roam at large or who are at large are presumed to recognize the hazard. The hazard of that pool was obvious to Edgar before he ever got to the pool or on top of the deck or however.  We don't know if he went up the deck. We don't know if he climbed over the pump or climbed on the pump. But somehow he got into that pool, and the obviousness of that danger was known or readily obvious before he gets on the deck and encounters a pool, assuming he went through the deck, before he ever encounters the solar cover. So there's no confusion. You can't look at the swimming pool and say, oh, gee, that's a trampoline, and then get up on the deck and then say, oh, wait, there's water. It's a swimming pool. It's a swimming pool. The risk and danger is obvious from the outside. This isn't like in the Kim case where there's an in-ground pool, and the tarp is stretched over, and you don't see, necessarily see the pool. And I think that's what the court held in Kim, was that it wasn't the risk of the pool that was the condition, that was the issue. It was the tarp covering it. And with the tarp over it, the children would now, again, the standard is fire falls from height and drowning in water that children are expected to recognize. They're not expected to recognize there's a tarp, and I may fall through the tarp, or there's a little puddle of water, and there's some water on the tarp, and that tarp may not hold my weight, and I may fall into the water, or I may fall into the pool, or I may fall into the collected water on the tarp. Kim doesn't apply. In Justice Pence, you are correct. I think it was Justice Pence. In Kim, maybe it was your Honor. But in Kim, the plaintiffs thought that Ms. Kim was washing the children. The mother, I believe it was, testified that when she left, she thought Ms. Kim, the defendant, one of the defendants, was washing the children. That doesn't exist here. There was no indication that Mr. Heffron ever contemplated that that child was not going to be supervised. When he's in front, and apparently when he's in front, according to Ms. Fernandez, when he's in front, she goes in the back with her grandchild and her two parents, and Edgar is in the front with the father. So according to, as far as Mr. Heffron knows, the children are being supervised. Edgar is with his dad. The small female child is with her grandmother. And then Edgar goes, I'm sorry, the father goes back to the gate with Edgar and comes back alone. And at that point, if Mr. Heffron even noticed, I don't remember on the record if he noticed, but when the father comes back and Edgar is not with him, Mr. Heffron would think, okay, now the child is in the back with Ms. Fernandez and the grandparents. And Mr. Heffron also doesn't know the relationship of these people. I think it's pretty clear that Mr. Heffron thought that Ms. Fernandez and Mr. Fernandez, her brother, were in fact the parents of Edgar. And so he's under the assumption his child is there with his parents and two of his grandparents. Well, let me ask another question. Wouldn't all this merchandise for sale at this yard sale in the backyard actually be a distraction so that it was foreseeable that someone wouldn't notice this pool? Absolutely not. And why not? And the plaintiff and the appellant in their initial briefing make this description of how the merchandise is scattered across the lawn and it hides the pool and people are distracted and you can't see it. There's merchandise on the front lawn, in front of the house, and there's merchandise in the back of the house to the left. And you have to walk. You walk in the back gate along the side of the house. You get to the back, you open up the gate, you take a step or two, and then there's a walkway across the back of the house and the merchandise is at the far end on a patio by the staircase to the pool. But immediately in front of you is a swimming pool. And as you're walking, there's a couple of small items. I think there's like a propane tank or something along the side of the walkway. As you're walking past, the pool would be here, the house is here. You can't miss the swimming pool. You have to walk past the pool to get to the merchandise. You have to walk by the swimming pool within feet of what appears to be about a 24-foot round swimming pool that you have to walk by, and there is absolutely nothing hiding in the swimming pool. And I disagree with Mr. Kasterman that the father did not know that the pool was there. In Ms. Fernandez's deposition, to some length, I'm not going to say great length, but she is standing at the far end by the patio where the merchandise is. And she says, the father comes through the gate and looks at her, and they make eye contact. And he says something about, is there something I would be interested in? And she says, no, it's just boots and purses. And he then leaves, and apparently, according to Ms. Fernandez, he said something to the effect, Adam is coming with you or something. But for him to come through the gate, the gate is here, and then there's a couple steps before you get to the back of the house. He goes through the gate, takes a couple, he has to, because she again says they have eye contact, he has to get in the yard, he has to see that pool. That pool is directly in front of him. He walks toward the pool and then looks to his left to see Ms. Fernandez. You can't miss the pool. And as your honor said, Justice Zenoff, as you said, it's an objective standard. It's not did they see this pool or not, it's would the defendant expect them to see the pool or would a property owner expect them to see the pool. They both walk right at the pool. The other thing is, and I submit to be contemplated, is the grandparents are there. Now, my client is simply hosting a garage sale. He sees two children arrive with four adults. There is nothing told to my client that only one person is supervising these children, only two people are supervising the children. He sees four adults arriving with two children, and it's his expectation, I submit, as a property owner, that all four adults are watching these children. I don't have to watch them. Well, what about having an effective latching mechanism on this deck gate? I mean, according to the police officer's affidavit, there really was no effective latching mechanism. Shouldn't the defendant have known that and warned the people coming into the yard sale about that? No. Why not? One, because the latching gate is not the proximate cause of this incident taking place. Say that again, please. One, the latching end gate is not the proximate cause of this incident taking place. It's a condition, is that right? It's just a condition. It's a condition that allowed this to happen. It's the parents, or the, I'm sorry, the adults supervising the child. If you could argue that, well, I knew the pull was there, but I let my child go up on the deck, and knowing that my child was going near a pull, but I had some expectation that there would be a latch there. Maybe there can be a conversation about that, but they weren't watching this child. There was no expectation that that gate wasn't going to open. They're just not watching the child. And a couple of final comments. In the reply brief, it's pointed out that I did not address the pre-case. I just wanted to say that. And I think, Judge Sengoff, you said at the beginning, isn't this a case about parental supervision? It's not a case about a child running at large. And what is the duty to a child running at large? It's an obvious condition. The fire, fall, risk of drowning issue. Plaintiff's counsel is arguing that it should be changed into local. It doesn't apply to this case. In period, I think, the child, 7-year-old, there was a ditch, a drainage ditch with ice, with snow over it. The child would be confused and wouldn't recognize it as a condition. That's not what we have here. And that child was unattended. Here we have a child that's under supervision. There's a pool sitting right there. This is a case where it's parental supervision. The other thing is, the argument is made in the reply brief, that this whole instance could have been avoided had Mr. Heffern put up a simple sign with eight words. I think there's a pool in the backyard. One, there is no duty to put up a sign for an open and obvious condition. Again, the standard is subjective. Is it something that should be expected to be recognized either by the child or by the supervising adult? And we have the supervising adults here. But if my client put up a sign, we would be here. I don't want to say we would be here, but the issue would be different. The issue would then be, well, now you've assumed a duty where you didn't have to warn about an open and obvious swimming pool. But if you put up a sign, you've now recognized it. You've taken on some duty to warn. And then it's how big of a sign do we have to put up. We have to put up a sign big enough that people are going to recognize and people that are going to recognize who aren't going to recognize the swimming pool itself. So the sign has to be big enough. I propose it has to be bigger than the swimming pool for people to say, okay, well, I missed a pool, but now I see the sign. The other thing is, in this matter, it's my understanding, the impression I get is Ms. Fernandez did not speak English. She testified through the interpreter. The father of Edgar, it's my understanding, lives back in Mexico. He doesn't speak English. So when you put up a sign, how many signs do you now have to put up? My client's garage sale was in an area or a community that has a Hispanic population. So you put up a sign in English, and now you say, okay, well, now you put up a sign and you know there's going to be Hispanic people or non-English-speaking people here. So now you have to put up two signs. And we're creating the slippery slope where all of a sudden my homeowners are taking on duties that just simply don't exist. This pool was open and obvious. And it's sad, but it's a case of personal supervision. It's not a case of my client having any duty of care. Okay. I think that answers any of the questions. Thank you very much. Mr. Kessler. Just to be clear, my brief did not even assign to be put up. I firmly believe in my brief argument that the defendant very simply needed to say, there's a pool back there, be careful. He would need to say that to everybody coming into his yard sale? Is that what you're arguing? He needs to say it to the family with two young children that he directed back there. So only children, only people with children he needs to tell? Yes. In Spanish? First of all, my clients speak English. We did do one of the depositions in Spanish as an accommodation to this one. But there's no – my clients speak English, and I take offense to the claim that they don't. There's no – it's not even close to being on the record. Is that in the record? No, no. They speak English. Either way, is it in the record? I don't want to answer that question to be blunt. But I've also never been asked in any case to prove that my client spoke English. If that was the case, that would come up a long time ago. My clients speak English. But I want to say – So going back to – so you're saying that any time anybody came with children, then there's a special duty that a landowner has to warn of a pool? That's right. And I think if you look at Eau Claire, the court says this is not a case where the mother and child arrive at a home and have never been told of a pool, and before the parent can warn of a pool and take precautions, the child enters the pool. Or the same thing in Stevens. We note that the mere allegation that a child was accompanied by his parents may not relieve the landowner of his duty to the child. But in Eau Claire, really, the mother was negligent in her failing to lock that door leading to the pool, was she not? That's right. But here, this is a miscommunication. This isn't necessarily negligence. Because certainly, if the aunt had known the second child, Edgar, was back there with her, she would have done the same thing when she saw Kelly missing. She would have gone up to try to find the missing child, right? She knew her granddaughter was there and didn't get to her granddaughter until Edgar was already in the pool. So even had she known that she was in charge, she wouldn't have gotten to him in time. Now, she may have gotten to him in time. We don't know that. She may have gotten to him in time. We don't know that. That's not known. That's speculation. All inferences will be drawn in favor of the non-movement pair. But you're saying she wouldn't have gotten to him in time. Why did she get to Kelly? Because Kelly was still on the deck. The child was already in the pool. How do we know he was already in the pool? Is that in the record? Because the tarp's moving. I think that would be the inference, that the tarp that was fully on the pool has now been moved in it. And she testified. It was moving when I looked at it. I thought there was some kind of filter going or something along those lines. So the strong inference is I think it's more than just a reasonable inference. He's in the pool at that point in time, okay? So whether she knew she was supervising him or not, I don't think would have made a difference. And one last thing. Wait a second. You're saying if she knew she was supervising him, she would not have been paying the same amount of attention as she did to the little girl? I'm saying the attention she paid to the little girl, she caught the little girl at a time that was too late for her. He was already in the pool. Right. But had she known, she's displayed her supervision of the young girl more than sufficiently. And so your position is that if she knew she was supervising Edgar, she would not have done that? Can I just suggest that maybe she didn't supervise the granddaughter as well as she should have given the fact that the granddaughter was in the pool? Nonetheless, it was sufficient. Right. But it wasn't for Edgar. So if she knew she was in charge of Edgar at that point in time, I don't think she gets to him in time. Now, she may look harder to see he's in the pool. She may be more diligent in trying to figure out, well, she would have been more diligent in trying to figure out where he was at that point in time. But the reason she doesn't realize that the water in the pool moving and the tarp moving is Edgar is because she doesn't know that she's in charge of Edgar at that point in time. She doesn't even know that he's back there. Well, the only person who knew he was back there is Miguel. Right. And his father. Possibly. I guess it's speculation. Possibly. Right. So I would just want to end with this. We're talking about a question of fact, okay? We aren't here to decide whether or not, based upon the majority of the evidence or as things look, the father is primarily responsible or the aunt is primarily responsible. The very simple question is this. Under these facts, where the defendant directs a family with small children in his backyard and doesn't tell them about the existence of a pool, is there a duty? And I would suggest to you that under all of the cases, under each and every case, when read properly, the conclusion is that there is a duty. The breach, the parent's negligence in comparative fault, the aunt's negligence in perhaps being an additional cause are all issues that should be resolved by a jury in this case. Thank you very much. Thank you. Thank you, counsel, for your arguments in this case. The court will take the matter under advisement and render a decision in due course to stand adjourned for the day. Thank you.